# EXHIBIT 3

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>JAMES COREY GOODE,<br><br>STACY HARTMAN GOODE,<br><br>Debtors. | Bankruptcy Case No. 25-16569-JGR<br><br>Chapter 13 |
| GAIA, INC.<br><br>Plaintiff,<br><br>v.<br><br>JAMES COREY GOODE,<br><br>Defendant. | Adv. Pro. No. 1:26-01007-JGR |

## DECLARATION OF KIERSTEN MEDVEDICH

I, Kiersten Medvedich, being duly sworn, do hereby depose and say:

1.     I am over the age of eighteen (18) years and believe in the obligation of an oath.

2.     I am President and Chief Executive Officer of Gaia, Inc. ("**Gaia**") and as such I have personal knowledge of the facts set forth herein.

3.     Gaia is a global conscious media and community company that operates a global digital video subscription service that caters to the "disclosure" community.

4.     Gaia has a digital content library of over 8,000 titles available to its subscribers.

5.     It is my understanding that James Corey Goode ("**Mr. Goode**") owns and operates Goode Enterprise Solutions, Inc. ("**GES**").

***Contracts Between the Parties***

6.      Gaia first commenced a contractual relationship with GES in 2015 by entering into a Talent Agreement, dated as of June 20, 2015 (the "**2015 Contract**"), pursuant to which Mr. Goode agreed to appear on Gaia programming.

7.      The 2015 Contract contemplated production of at least 52 programs of approximately 30 minutes each (collectively, the "**Programs**," and each, a "**Program**").

8.      Pursuant to the 2015 Contract, Mr. Goode agreed to perform on-camera services, attend rehearsals, attend photography, voice-over and "re-take" or "overdub" sessions, consult regarding development and pre-production of Programs, and promote and market the Gaia Programs in which he appeared (collectively, the "**Talent Services**"). In exchange for the above services, Gaia agreed to compensate Mr. Goode.

9.      Thereafter, Gaia and GES entered into a second Talent Agreement, dated as of August 22, 2016 (the "**2016 Contract**"). The 2016 Contract likewise contemplated that Mr. Goode would provide Gaia with Talent Services, including his appearance in Gaia Programs. (The number of Programs was to be determined based on good faith discussions between the parties). The 2016 Contract was set to end the later of July 31, 2017, and the completion of the agreed Talent Services, and was automatically renewable for successive one-year terms unless terminated by either party. The 2016 Contract contemplated termination for "cause" upon 30 days' written notice ("cause" included failure to perform under the contract as well as making malicious or defamatory statements about Gaia, Gaia-affiliated parties, and the Programs).

10.     The 2016 Contract was renewed by an amendment dated as of August 18, 2017 (the "**August 2017 Amendment**"). Pursuant to the August 2017 Amendment, among other revisions, Gaia agreed to pay $50,000.00 to Mr. Goode in exchange for his appearance at two future live

2

events (the "**Live Events**"). The amendment also contemplated the payment of a $25,000.00 advance of the fees that would be due for his appearances at the Live Events (the "**Advance**").

11. Gaia paid the Advance to Mr. Goode on or about August 25, 2017.

12. Mr. Goode did not appear at any Live Events for which he received the Advance.

13. Gaia and GES further amended the 2016 Contract on or about November 7, 2017 ("**November 2017 Amendment**" and, together with the August 2017 Amendment, the "**Amendments**"). Pursuant to the November 2017 Amendment, the parties agreed that Mr. Goode would continue performing Talent Services in respect of Gaia Programs (again, the number of Programs to be determined in good faith discussions). Related thereto and made a part thereof, Mr. Goode (on behalf of himself), executed a Relocation Benefit Agreement, dated as of November 17, 2017, providing the terms pursuant to which Gaia agreed to pay up to $20,000.00 of Mr. Goode's relocation expenses (the "**Relocation Benefit**").

14. The November 2017 Amendment (including the Relocation Benefit Agreement) contemplated that Mr. Goode would not have to repay the Relocation Benefit to Gaia if (and to the extent that) Mr. Goode remained "Under Contract" (as defined below) with Gaia for a period of 36 months from the date of relocation. Mr. Goode was required to repay the Relocation Benefit, on a prorated basis, based on the amount of time in the 36-month period following relocation during which he was not "Under Contract" with Gaia.

15. "Under Contract" is defined in the Relocation Benefit Agreement to require, *inter alia*, that Mr. Goode appear in at least 360 minutes of published Gaia content per quarter.

16. The Relocation Benefit Agreement further provided that "in the event legal action is brought to enforce the terms of this Relocation Benefit Agreement, the prevailing party shall be entitled to recover reasonable costs of such include, including attorney's fees[.]"

3

17.     It is my understanding that Mr. Goode relocated from Texas to Colorado in or around November 2017.

18.     Gaia made two separate payments to Mr. Goode in December 2017, totaling $11,069.62 (collectively, the "**Relocation Payment**" and, together with the Advance, the "**Payments**") (Gaia paid $6,083.62 to Mr. Goode on December 11, 2017 and $4,986.00 on December 18, 2017).

19.     In each quarter following Mr. Goode's relocation through the termination of the 2016 Contract for cause as of August 12, 2018, Mr. Goode failed to appear in 360 minutes of published Gaia content.

### *Fraudulent Misrepresentations and False Pretenses*

20.     During the months prior to the payment of the Advance and the Relocation Payment, Mr. Goode caused Gaia to enter into the Amendments and make the Payments by affirmatively representing that he had enough material to continue producing content throughout the agreed contract term and intended to perform his obligations under the Amendments.

21.     Specifically, in or around April 2017, Mr. Goode discussed with Gaia production of a new show designed to focus on Mr. Goode's personal experiences ("Above Cosmic").

22.     As discussions progressed, on or around July 29, 2017, Mr. Goode represented that he had sufficient material for 38 episodes of Above Cosmic.

23.     Mr. Goode also represented that this new material could serve as content for use at future live events.

24.     Based, in part, upon Mr. Goode's affirmative representations that he had enough new material for future live events and additional Programs, Gaia entered the August 2017 Amendment and paid the Advance.

4

25. Mr. Goode also caused Gaia to enter into the November 2017 Amendment and make the Relocation Payment by representing that he intended to perform his obligations under the November 2017 Amendment, had enough material to develop and produce Above Cosmic throughout the agreed contract term, and that it would be best if he moved to Colorado since he had a lot of content to shoot and would be on-site at Gaia's headquarters in Louisville, CO, to do so. After signing the November 2017 Amendment, I understand that Mr. Goode also requested financial contributions from the public to support his relocation to Colorado even though Gaia was reimbursing him for relocation expenses.

26. Gaia would come to learn, after agreeing to the Amendments, that Mr. Goode could not perform the above-referenced Talent Services. Specifically, a pilot was filmed during which Mr. Goode was repeatedly unable to recall his own "story" and required continual prompting from his manager to do so, indicating that the narrative was not based on genuine recollection and was instead mostly or entirely fabricated.

27. Shortly following his receipt of the Payments, Mr. Goode failed to appear for scheduled production dates for Gaia Programs, failed to provide truthful content for Above Cosmic, and made false and defamatory comments directed to Gaia and affiliated individuals.

28. Gaia relied on Mr. Goode's representations that he would continue to produce Programs and otherwise perform the Talent Services in deciding to pay the Advance and the Relocation Payment to Mr. Goode.

29. In fact, Mr. Goode could not perform the Talent Services contemplated in the Amendments (including performance at the Live Events and continued production of Gaia Programs) and knew that he did not have enough truthful material to continue making Programs, prior to Gaia making the Advance and the Relocation Payment. However, he misrepresented those

facts to cause Gaia to make the Payments. Gaia would not have proceeded with the Amendments, or the Payments, but for Mr. Goode's representations of his ability and intention to continue performing the Talent Services.

30. Shortly after receiving the Relocation Payment, Mr. Goode stopped appearing at production events and stopped performing his other obligations under the Amendments. He also made numerous defamatory statements about Gaia and affiliated individuals.

31. Gaia terminated the 2016 Contract on 30 days' written notice, effective on August 12, 2018.

32. Mr. Goode has not reimbursed Gaia for either the Advance or Relocation Payment, despite numerous demands.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that I have examined the foregoing declaration and the statements therein, and, to the best of my knowledge, the declaration and the statements therein are true, correct and complete.

Kiersten Medvedich